| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **FILED UNDER SEAL** US DISTRICT COURT BRIDGEPORT CT |
| | : | |
| v. | : | |
| | : | MISC. NO. |
| CARLOS COLON, a.k.a. "Camby" | : | |
| CARLOS COLON, a.k.a. "Joel" | : | April 14, 2014 |
| NELSON DIAZ | : | |
| MARKUS MENDEZ | : | |
| HIRAM MOJICA, a.k.a. "Gringo" | : | |
| TREVOR PIERCE | : | |
| HUMBERTO SOTO | : | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS

I, Jeffrey Massey, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been an ATF Special Agent for approximately five years. During the course of my career, I have participated in numerous criminal investigations into robbery, firearms trafficking and narcotics trafficking. My participation in the investigations has included coordinating controlled purchases of firearms and controlled substances utilizing confidential informants, cooperating witnesses, and undercover officers; coordinating and conducting the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to firearms and controlled substances trafficking; testifying in Grand Jury proceedings; and interviewing individuals and other members of law enforcement regarding the manner in which firearms and narcotics traffickers obtain, finance, store, manufacture, transport and distribute firearms and controlled substances.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to

1

conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.    I am currently working with other members of the ATF and with other law enforcement officials to investigate Carlos COLON, a.k.a. "Camby" (COLON 1), Carlos COLON, a.k.a. "Joel" (COLON 2), NELSON DIAZ, MARKUS MENDEZ, HIRAM MOJICA, a.k.a. "Gringo", TREVOR PIERCE, and HUMBERTO SOTO for violations of Title 18, United States Code, Sections 1951(a) (conspiracy to commit Hobbs Act robbery), 924(c)(1)(A)(i) (carrying a firearm during and in relation to a crime of violence), and 2 (aiding and abetting), and Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 (conspiracy to possess with intent to distribute narcotics).

4.    The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided by members of the ATF and other law enforcement agencies; (3) witness statements; (4) information from the Department of Motor Vehicles; (5) public information and law enforcement databases; (6) my experience and training and several other sources of information. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and in part except where placed in quotation marks.

5.    Because this affidavit is being submitted for the limited purpose of securing criminal complaints, I have not included each and every fact regarding this investigation. Rather, I have set forth only the facts necessary to establish probable cause to believe that COLON 1, COLON 2, DIAZ, MENDEZ, MOJICA, PIERCE, and SOTO have violated Title 18, United States Code, Sections 1951(a) (conspiracy to commit Hobbs Act robbery), 924(c)(1)(A)(i) (carrying a firearm during and in relation to a crime of violence), and 2 (aiding and abetting), and

2

Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 (conspiracy to possess with intent to distribute narcotics).

## PROBABLE CAUSE

6.    As discussed in detail below, since approximately April 2013 through to the present, the ATF, the Federal Bureau of Investigation ("FBI"), and the Bridgeport Police Department have been investigating COLON 1 and COLON 2 for narcotics trafficking. The Ponce Auto Care Center, in Bridgeport, Connecticut, which is the location out of which COLON 1 and COLON 2 deal narcotics, is well-known to law enforcement as a location from which narcotics are sold.

7.    This information was corroborated by FBI agents who confirmed that, at the direction of law enforcement, a Confidential Informant ("CI-3"), whose information has proven to be accurate and reliable, had twice purchased a quantity of cocaine from COLON 2 at the Ponce Auto Care Center. Specifically, in the first week of April 2013 and in the third week of August 2013, CI-3 met with COLON 2 at the Ponce Auto Care Center. On both occasions, law enforcement officers observed CI-3 enter and soon thereafter leave the Ponce Auto Care Center. Agents then met with CI-3 at a pre-determined location where CI-3 provided agents with a clear plastic bag containing a white powder which subsequent field tests confirmed to be cocaine.

8.    On March 27, 2014, an ATF Confidential Informant ("CI-2"), whose information has proven to be accurate and reliable, conducted a controlled purchase of narcotics from COLON 2. Prior to the controlled purchase, CI-2 and CI-2s' car were searched for contraband or excess money with negative results. CI-2 was then provided with a recording device and prerecorded funds in order to purchase the narcotics. CI-2 then drove to the Ponce Auto Care Center where CI-2 met with COLON 2.

3

9.     ATF agents thereafter met with CI-2 at a prearranged location. There, CI-2 provided the agents with the bag of narcotics purchased from COLON 2, which was later found to contain approximately one ounce of a substance that field-tested positive for cocaine.

10.     On April 3, 2014, CI-2 attempted another controlled purchase of narcotics from COLON 2. Prior to the attempted controlled purchase, CI-2 and CI-2's vehicle were searched for contraband or excess currency with negative results. The CI-2 was then provided with a recording device and prerecorded funds in order to purchase the narcotics.

11.     CI-2, at the direction of law enforcement, travelled to the Ponce Auto Care Center and met with COLON 2. COLON 2 stated, "I'm waiting for my boy. He's supposed to be here in a little bit." COLON 2 then asked CI-2, "What is it? Same thing?" CI-2 responded, "I was gonna get two of them. Two ounces." COLON 2 replied, "He say he should be here in a little bit, like twenty minutes."

12.     CI-2 then asked COLON 2, "Do you know anybody that, like, hit licks and shit?" After expressing confusion regarding CI-2's questions, COLON 2 called over to COLON 1 and asked him to join the conversation. Once COLON 1 entered the discussion, CI-2 asked, "Stick up kids, you know any of them?" COLON 1 responded, "Stick up kids," and COLON 2 said, "Ah, yeah," seemingly indicating his understanding of CI-2's question. CI-2 explained that he was asking on behalf of his/her "Cuban buddy." Based upon my training and experience, I know that a "lick" is a reference to a robbery, and that "stick up kids" is a reference to individuals who commit robberies.

13.     COLON 2 asked CI-2 if CI-2 wanted to "Do something?" and asked, "Out here, or?" CI-2 explained that he/she did not know the details and that COLON 1 and COLON 2 would have to meet with CI-2's associate if they were interested. COLON 2 then said, "I can let

4

you know, and I would like to know, you know, I gotta know what, what's gotta do. My boys, you know, I got couple of my people but they, they not doing that that around." CI-2 suggested that COLON 1 and COLON 2 meet with CI-2's "Cuban buddy" to discuss the details. COLON 2 asked, "He got cash?" Again, CI-2 explained that he/she did not know the details of the potential robbery. COLON 2 then stated, "I got my people. I just fuckin' talk to them and, like, they do what they do." COLON 2 explained that his people "don't play." CI-2 stated, "I don't need no little young ass kids," to which COLON 2 responded, "When we do this shit, we do it right, yo. We do shit right. Even though, sometime, when I got shit like that, I just call two, three of my [friends] from the islands. They come over here, they do whatever, they go back. Nobody know what they do, who they are. You just gotta let me know what, what, exactly, you need to get done. Show that they, you know, go around, show who it is, what, they do what they gotta do." CI-2 asked when he/she could bring his/her associate to meet with COLON 2. COLON 2 stated that he could meet the following day. COLON 1 departed the area of this conversation while the conversation was still ongoing.

14.     On April 4, 2014, CI-2 introduced an undercover ATF agent ("the UC") to COLON 1 and COLON 2. On that date, CI-2 and the UC met with COLON 1 and COLON 2 at the Ponce Auto Care Center. During the meeting, which was audio and video recorded, the UC observed COLON 1 and COLON 2, in addition to other males, in the main office area and in an adjoining room at the Ponce Auto Care Center. The UC exchanged greetings with COLON 1 and COLON 2. The UC then asked COLON 2 if he would rather speak in English or in Spanish, to which both COLON 1 and COLON 2 expressed their preference to speak Spanish. As a result, the majority of the remaining conversation was conducted in the Spanish language.

15.     COLON 2 stated that CI-2 had talked to him about obtaining narcotics and asked

the UC how much of the narcotics the UC wished to obtain. The UC replied that CI-2 had told him that COLON 1 and COLON 2 were interested in "un tumbe," which literally translates to a "knock down," but is slang for a robbery. COLON 2 then confirmed that CI-2 had spoken to him about obtaining individuals to commit a robbery, and continued to explain that he questioned CI-2 about the details of the robbery, such as its location, timing, and intended victim. The UC advised COLON 1 and COLON 2 that he would explain the details.

16. The UC stated, in substance, that he was a courier for a Cuban trafficking organization. The UC continued that his job was to pick up one to two kilograms of cocaine for distribution from different houses located off of Interstate 95 between Stamford and Norwalk, Connecticut and then to deliver the drugs to another location. The UC further explained the process through which he received the narcotics. Specifically, the UC stated that, on the day of the pick-up, he is told to wait at a specific location. A member of the organization would then call the UC and provide him with an address, at which to pick up the drugs, and an allotted a period of time in which to arrive. The UC has always observed two individuals in the house from which he picks up the drugs, one of whom was armed with a firearm. The armed individual stayed with the UC, while the second individual went into another room in the house and returned in possession of the cocaine that the UC was to transport. The UC stated that, while waiting for the cocaine, he observed an additional fifteen marked kilograms of cocaine in the living room of the house.

17. COLON 2 questioned the UC as to the number of kilograms of cocaine in the house. In response, the UC confirmed that there would be fifteen kilograms. The UC stated that he was due to receive a call on Monday, April 7, 2014, and would be told the exact day of the pick-up. The UC further stated that he does not talk on the phone, and would have to meet

COLON 1 and COLON 2 in person subsequent to receiving the information. COLON 2 then asked when they needed to enter the house. The UC responded by saying that depended on how the "people" were going to commit the robbery, and explained that when entering the house, he closed the door, and upon departing, he opened the door.

18.     At the conclusion of this explanation, the UC asked, "How does it sound?" COLON 2 replied, "It sounds good." The UC advised that the proceeds of the robbery – kilograms of cocaine – would be divided in half: COLON 1, COLON 2, and their associates would receive one half, and the UC and CI-2 would keep the remaining half. COLON 2 then asked, "But that's for sure?" The UC responded, "for sure, for sure." COLON 2 then asked the UC, "Every week?," meaning that the UC picked up kilograms of cocaine weekly. The UC responded, "No, no, every two weeks." COLON 2 then confirmed that the UC picked up the cocaine "when they call you," and the UC replied in the affirmative.

19.     COLON 2 then questioned the UC as to the number of individuals in the house. The UC again replied that he had observed two individuals. The UC and COLON 2 discussed the fact that the houses were always different. COLON 2 stated, "It can be done." COLON 1 then questioned whether the individuals inside the house were armed, to which the UC replied that he had observed one of the individuals to be armed; however, he was not sure if the other individual was also armed. COLON 1 further questioned if the UC had observed any other firearms inside the house. The UC responded, "No." COLON 1 advised the UC that if the individuals in the house took out their firearms, his associates would "clean them out fast." COLON 1 assured the UC that his associates knew what they were doing. Both COLON 1 and COLON 2 advised the UC that they have associates whom they used when they needed to collect money or had a large problem. COLON 2 explained that these associates had jobs, but would

complete the robbery and then return to their normal lives.

20.    COLON 2 questioned the UC as to how they could remain in communication. The UC replied that, once he received a call on Monday, he would travel to the Ponce Auto Care Center and meet with COLON 1 and COLON 2. COLON 2 stated, "They are already waiting. They already know that in a few days something is going to happen, so they are counting on you that things are happening." Based on my training and experience, I believe that COLON 2 was indicating that he had already contacted the individuals who would commit the robbery and that they were waiting for the UC's confirmation that the robbery would occur, as well as the details of the robbery's time, date, and location. The UC assured COLON 2 that it would happen and asked COLON 2, "Are we good?" COLON 2 replied, "Yes." The UC then shook hands with COLON 1 and COLON 2, at which time the UC and CI-2 departed the Ponce Auto Care Center.

21.    On April 7, 2014, CI-2 and the UC met with COLON 1 and COLON 2 at the Ponce Auto Care Center. This meeting was audio and video recorded. The UC and CI-2 entered the Ponce Auto Care Center and observed COLON 1 and COLON 2 in the main office area. The UC exchanged greetings with COLON 1 and COLON 2, then followed them into a room adjacent to the main office.

22.    COLON 2 asked the UC if everything was good. The UC replied that all was good and that he had spoken with his associate. The UC advised that the pick-up would occur on Friday, April 11, 2014, and that on Wednesday, April 9, 2014, he would be told the area where he was to wait and the time at which he would be called and informed of the stash house's address. COLON 2 questioned the UC as to how many kilograms would be present. The UC responded that he received one to two kilograms and that he had observed an additional fifteen kilograms in the house. The UC detailed, however, that they obtained the kilograms that he

8

transported from the back of the house and not from the fifteen. As a result, he did not know if there was more cocaine in the back of the house or what else may be in the back of the house. The UC questioned COLON 2 if everything was good. COLON 2 responded, "Yes. It's good."

23. The UC requested to meet with COLON 1 and COLON 2 on Wednesday to provide them with the information he was to receive on that day. The UC also requested to meet with the crew that was going to execute the robbery. COLON 1 stated, "Wednesday or Thursday, when they tell you." COLON 1 advised the UC that, once he received the information, he would have the crew available. COLON 2 stated that the crew needed to see the UC's face. The UC shook hands with both COLON 1 and COLON 2, at which point the UC and CI-2 departed the Ponce Auto Care Center.

24. On April 9, 2014, the UC and CI-2 travelled to the Ponce Auto Care Center to meet with COLON 1 and COLON 2. Upon arriving at the Ponce Auto Care Center, the UC and CI-2 entered the washing bays of the business. The UC observed COLON 1 and COLON 2 in the washing bays, and eventually followed them into the main office area and its adjoining room. The UC began the conversation in the Spanish language. This meeting was audio and video recorded.

25. The UC advised COLON 1 and COLON 2 that he had been contacted and told that he would be called on Friday, April 11, 2014 at 5:30 pm and given the stash house's address. The UC further advised that he was told to wait near Exit 6, south of Stamford, Connecticut for this call. The UC questioned COLON 2 as to the whereabouts of the crew. COLON 1 and COLON 2 stated that the crew was in the area and they were ready. The UC requested to meet the crew the following day. Both COLON 1 and COLON 2 agreed to this arrangement. At this time, a male, later identified as Hiram MOJICA, walked into the room. COLON 1 and COLON

9

2 stated, "He's one of them." The UC exchanged greetings with MOJICA, who introduced himself as "Gringo." MOJICA advised the UC that he could speak to him in both English and Spanish. The UC then began to speak in English.

26.     The UC explained that he was a courier of cocaine for a Cuban organization. The UC advised that he was due to conduct a pick-up and delivery of cocaine on Friday, and would be called at 5:30 pm. Prior to the pick-up, the UC was instructed to wait at Exit 6, due to the fact that the house was located "down South." The UC stated that, based on prior experience, he expected that there would be two individuals in the house, one of whom would be armed with a firearm. The armed individual would stay with the UC, while the second individual would go to a back room and retrieve the two kilograms the UC was to transport. The UC stated that, while waiting for the cocaine, he had previously observed an additional fifteen marked kilograms of cocaine in the living room. The UC further stated that the stamps on the kilograms would have to be removed subsequent to the robbery.

27.     The UC advised MOJICA that the kilograms of cocaine they obtained from the robbery would be divided half and half, with half for COLON 1, COLON 2, MOJICA and their associates, and half for the UC and CI-2. The UC stated that he wanted to ensure that he did not get "fucked up." COLON 2 advised that they needed to say "nobody moves" upon entering the house. The UC, COLON 2, and MOJICA then discussed not harming the UC during the robbery.

28.     MOJICA questioned the UC if there were any additional individuals in the house. The UC replied that all he had observed were the two individuals. MOJICA further questioned the UC if a police station was in close proximity to the house. The UC responded, "No, no, the houses are always in chilled out places."

10

29. COLON 2 questioned the UC if he was definitely sure that the cocaine would be present. The UC replied that he was positive the cocaine would be there. COLON 1 questioned whether the UC observed the reported amount of kilograms every time he entered the house. The UC replied in the affirmative. COLON 2 told the UC that they had been thinking about the robbery turning out in a positive fashion all week.

30. MOJICA stated that he was not afraid of cameras or the individuals in the house, but that he feared guards outside the house. COLON 2 discussed the importance of conducting the robbery in a timely manner. MOJICA stated he had been thinking of entering the house with a silencer and shooting one of the individuals in the thigh in order to intimidate the second individual. MOJICA advised that, if shots were fired, he would have a short window of opportunity to complete the robbery.

31. COLON 2 advised the UC that they would all meet the following day. COLON 2 further advised that all the individuals who would be involved in the robbery would be present at the meeting. At the conclusion of the meeting, MOJICA mentioned other robberies of which he was aware where narcotics had been stolen without physical assaults. In response, the UC expressed to COLON 1, COLON 2, and MOJICA that the individuals in the house were not going to simply hand over the cocaine. The UC and CI-2 then departed the Ponce Auto Care Center.

32. On April 10, 2014, the UC and CI-2 traveled to the Ponce Auto Care Center, where they made contact with COLON 2, who led them into the main office area of the Ponce Auto Care Center. COLON 2 stated that he had been thinking about the robbery. COLON 2 expressed to the UC that his associates wanted to be sure that the cocaine would be present. COLON 2 stated that his associates were traveling to the Ponce Auto Care Center, and advised

11

that this was "serious" and he wanted to be sure that this was not a "set up." The UC assured COLON 2 that it was not a set up.

33.     COLON 1 entered the main office area and exchanged greetings with CI-2 and the UC. COLON 2 advised that he wanted his associates to see the UC's face. The UC and COLON 2 continued to review the logistics of the pick-up and the individuals who would be in the stash house. COLON 2 advised the UC that he had an associate who was going to execute the robbery, but that individual had been told that he had to surrender to court the following day, to begin serving a sentence.

34.     COLON 1, who had left the office during a portion of the conversation, returned to the main office area and advised the UC that his associates were traveling to the Ponce Auto Care Center. A male, who introduced himself as "OMAR," then entered the main office area and exchanged greetings. The UC, CI-2, COLON 1, COLON 2, and "OMAR" entered an adjoining office area. COLON 2 advised "OMAR" that he should conduct the robbery. COLON 2 requested that the UC explain the circumstances surrounding the robbery to "OMAR." COLON 2 suggested that the UC speak in the Spanish language.

35.     The UC stated, in substance, that he was a disgruntled courier of one to two kilograms. The UC stated that he was due to conduct a pick-up of cocaine the following day in the Stamford, Connecticut area. The UC stated that at 5:30 pm, he would receive a telephone call and be told the exact address of the house. Based on his prior experience, the UC explained that he expected to find two individuals in the house, one of whom would be armed with a firearm. The UC advised that he anticipated that he would stay with the armed individual while the other individual traveled to a back room, returning in possession of the one to two kilograms the UC was to transport. The UC stated that, while waiting for the kilograms in the past, he

observed an additional fifteen marked kilograms in the living room. The UC continued to state that the proceeds of the robbery would be divided half and half. COLON 2 explained to the UC that "OMAR" wished to conduct the robbery, but had been recently told he had to surrender himself to the court. COLON 2 stated that he was encouraging "OMAR" to execute the robbery prior to serving his sentence.

36.     During the conversation, "OMAR" asked the UC to describe the UC's relationship with the men who would be inside the house and how the men would treat the UC upon his arrival. The UC explained that he had known these men a long time and that they were friendly, but that ultimately their relationship was a business one. Twice during the conversation "OMAR" questioned the UC as to how they should execute the robbery. The UC communicated that the logistics were up to the crew and reiterated that he was the one to close the door upon entry and open and close the door upon departure. "OMAR" then stated that the UC would have to remain in the house during the robbery. "OMAR" assured the UC that he would not be harmed. "OMAR" stated they needed to be together prior to the robbery. COLON 1 advised "OMAR" that he should conduct the robbery. COLON 1 told "OMAR" that MOJICA would be involved in the robbery, and that they crew would consist of four individuals.

37.     "OMAR" then asked the UC if he had observed any rifles in the house. The UC replied that he observed one individual armed with a firearm and was not sure if the other individual was also armed. "OMAR" questioned the UC concerning the prior houses where the UC had picked up cocaine, asking him to describe the houses and whether they appeared to be lived in or generally vacant. The UC stated that they appeared to be occupied as someone's home.

38.     At the conclusion of this conversation, the UC asked "OMAR," "How does it

sound?" "OMAR" replied, "It sounds good." "OMAR" questioned COLON 2 regarding vehicles to be utilized during the robbery. COLON 2 responded that they could use the dealer vehicles on the lot.

39.     COLON 1 exited the room. The UC advised "OMAR" that the packaging on the kilograms needed to be removed subsequent to the robbery. COLON 2 and "OMAR" stated that they would sell the kilograms in small amounts. "OMAR" then exited the room. COLON 2 stated that he wanted the crew to see the UC's face due to the probability of a shooting occurring. COLON 2 advised that he had been thinking all week "how to do this shit." "OMAR" returned to the room and questioned the UC if they could pose as lawn workers or painters. The UC replied that that would not work.

40.     Later, during this same meeting, two additional men, later identified as SOTO and MENDEZ, arrived at the Ponce Auto Care Center. The UC, CI-2, COLON 2, "OMAR," SOTO, and MENDEZ met in a bay area of the Ponce Auto Care Center. SOTO asked the UC, "So what are we talking about here?" The UC began to explain why he was providing the information, and that he collected one to two kilograms of cocaine for distribution. SOTO then interrupted the UC, saying "basically just get to where we gotta go…what house we gotta go to." SOTO advised, "This like my brothers right here. I'm not trying to have nobody popped. Somebody pull out, we shootin'." MENDEZ questioned the UC as to how many individuals were in the house and if guns were present. The UC began to answer, and "OMAR" stated that one of the individuals was armed, and that he expected there to be additional firearms present.

41.     The UC explained the manner in which the pick-up generally occurs and the fact that one individual was armed with a firearm. The UC further explained that a second individual would travel to a rear bedroom and return with one or two kilograms for the UC. The UC

advised that he observed fifteen kilograms in the living room of the house. The UC further advised that the kilograms had stamps affixed to them that would have to be removed after the robbery. The UC asked SOTO "you feel me?" – meaning, did SOTO understand – to which SOTO responded, "I understand what you sayin'." SOTO then stated, "all I'm sayin' is that if anybody pull out, they gonna get popped...I know your face, that's all I needed to know man." Based on my training and experience, I believe that SOTO was expressing that if any of the occupants of the house brandished a weapon, he would shoot them and that he only needed to be able to identify the UC so as not to shoot him.

     42.     MENDEZ questioned the UC regarding the location of the house. The UC advised that he had been told to wait at Exit 6, in Stamford, Connecticut. "OMAR" stated that they all had to be together because the UC did not know the specific location of the house. SOTO advised that he would try to find "a shotty" because "trust me, ain't nobody tryin' to move with a pump." Based on my training and experience, I understand that SOTO wanted a pump-action shotgun ("a shotty" and "a pump") because he believed that the occupants of the house would not resist if confronted with a pump-action shotgun.

     43.     SOTO further stated that he could obtain two hand guns. SOTO further stated that they would "tape" the occupants of the house in order to give him and the crew enough time to escape. SOTO expressly told the crew that they could not have any cell phones, watches or anything else in their pockets that might identify them and that the cell phones of the occupants of the house would have to be taken from them and any hard line connections would have to be torn from the walls.

     44.     SOTO explained to the crew that, ultimately, they did not know what they would encounter in the house and that they could be walking into a "blood bath." He further stated, "I

usually have [my associates] already in the house. Whattup. It's an easy in and out…But I'm down." Based on my training and experience, I understood that SOTO was claiming to have conducted these robberies in the past but, in those instances, he had had a person already in the house to assist with the robbery. I further understood SOTO to have expressed his desire to conduct the robbery despite the risks ("I'm down").

45.     SOTO reiterated that if someone drew a firearm, he (SOTO) would shoot them. SOTO and "OMAR" discussed obtaining firearms. The individuals discussed how the robbery would be executed. The UC arranged for CI-2 to meet with the crew at the Ponce Auto Care Center the following day. SOTO and COLON 2 discussed distributing the proceeds of the robbery – kilograms of cocaine. SOTO stated that all of the participants must be dressed in black, not have cellular telephones, and have gloves. SOTO suggested creating fictitious tattoos in order to avoid identification.

46.     On April 11, 2014, CI-2 traveled to the Ponce Auto Care Center to make contact with COLON 1, COLON 2, and their associates. Prior to departing for the Ponce Auto Care Center, CI-2 and CI-2's vehicle were searched for contraband with negative results. CI-2 made contact with COLON 1 and COLON 2 at the Ponce Auto Care Center. For approximately the next hour, CI-2 had various conversations with COLON 1, COLON 2, and SOTO, during some of which they discussed the upcoming robbery. At one point, COLON 2 stated that his associate from yesterday who was going to "go in" – referring to "OMAR" – had actually surrendered to prison and hence, COLON 2 had to locate a replacement.

47.     After waiting for approximately one hour, COLON 1, COLON 2, and MOJICA entered CI-2's vehicle to travel to Stamford, Connecticut with CI-2. CI-2 was directed to the intersection of East Main Street and Burroughs Street in Bridgeport, Connecticut. While waiting

at this intersection, CI-2's vehicle was joined by a silver BMW sedan occupied by DIAZ and PIERCE. At that time, MOJICA exited CI-2's car and entered the silver BMW sedan, after which DIAZ, PIERCE, and MOJICA followed CI-2's vehicle to Stamford, Connecticut.

48.     During this drive, COLON 2 informed CI-2 that the "black" male in the BMW, referring to PIERCE, had previously committed a robbery where he tied up a "whole family" by himself.

49.     Upon arriving in Stamford, Connecticut, CI-2 was directed by COLON 2 to stop at an Advance Auto Parts retail store located at 305 West Avenue. At the Advance Auto Parts retail store parking lot, CI-2's vehicle was joined by a blue Volvo Sport Utility Vehicle (SUV), in which was SOTO and MENDEZ. COLON 2 informed CI-2 that "they" wished to stop at the Advance Auto Parts retail store to purchase "tape" or "straps." Once at the Advance Auto Parts retail store, DIAZ entered the store. CI-2, followed by the blue Volvo SUV and the silver BMW sedan, departed the Advance Auto Parts retail store, and traveled to 181 Harvard Street in Stamford, Connecticut, where the UC awaited the arrival of CI-2, COLON 1, COLON 2, and their associates.

50.     Shortly thereafter, the UC observed CI-2, COLON 1, and COLON 2 arrive at 181 Harvard Street in CI-2's vehicle. The UC observed the blue Volvo SUV arrive after CI-2, with SOTO as the driver and MENDEZ as the front passenger. The UC then observed the silver BMW sedan arrive, driven by DIAZ, with PIERCE as the front passenger and MOJICA seated in the rear bench seat.

51.     The UC greeted both COLON 1 and COLON 2. The UC approached the blue Volvo SUV containing SOTO and MENDEZ and spoke through the passenger-side window. The UC observed that both SOTO and MENDEZ were wearing black clothing. The UC

questioned when they anticipated entering the house, to which SOTO answered, "as you comin' in." The UC questioned SOTO as to the manner in which he was going to provide CI-2 his proceeds of the robbery – the kilograms of cocaine. SOTO replied that they were all going to get together to divide the proceeds. The UC further questioned SOTO if they were going to take the "fifteen keys of coke," to which SOTO motioned to COLON 1 and COLON 2 and stated, "That's the leader right there."

52.     COLON 1 advised they would take all the cocaine. The UC questioned COLON 1, COLON 2, SOTO, and MENDEZ if they were going to leave him in the house. SOTO stated, "What do you want to do? You want us to leave you in there?" SOTO further stated that they would tie the UC up. The UC responded that he would remain in the house.

53.     The UC walked to the vehicle containing DIAZ, PIERCE, and MOJICA. The UC observed MOJICA exit the vehicle from the rear driver's side door. The UC shook hands with MOJICA, continued walking to the vehicle, and then stopped at the driver's side window. The UC observed MOJICA to be wearing a grey colored shirt and black pants. The UC greeted DIAZ and PIERCE. The UC observed DIAZ and PIERCE to be wearing black shirts. In addition, the UC observed PIERCE wearing dark – seemingly black – gloves.

54.     After greeting the men, the UC asked the men if they "were squared away" and if they spoke English. In response, DIAZ stated, "Don't worry about it." DIAZ further stated that they were going to go "light" on the UC. The UC advised that he should have "one or two keys of coke in a bag and the other fifteen keys of coke would be in the living room." The UC stated that they had agreed to split the proceeds half and half. DIAZ again told the UC not to worry about it and shook the UC's hand. MOJICA returned to the vehicle and sat in the rear bench seat. The UC questioned DIAZ, PIERCE, and MOJICA, "So are we square?" No one provided

18

a negative response. The UC began to walk away from the vehicle.

55. As the UC walked away, DIAZ yelled for the UC to return. The UC complied and returned to the driver's side window. The UC explained the manner in which the pick-up of cocaine typically occurred; that the UC enters the house and shuts the door behind him, is given his package of cocaine, and then opens the door and exits. DIAZ questioned the UC, "Yo, how many dudes usually be in that house?" The UC stated that two individuals would be present, one of whom was short and overweight and would be armed with a firearm. DIAZ responded, "So the fat guy is the one we have to worry about?" The UC stated, "Yeah, exactly." DIAZ then stated, "okay, that's all I wanna know." The UC further stated, "So, when you guys, you guys are coming in as I'm in the house, so I'm going to the floor, brother." DIAZ replied, "Yeah, you going to the floor." PIERCE then stated, "Don't jump on the floor immediately." The UC advised that he wanted to make sure that he was not harmed but that he would "make it look good" to which PIERCE said, "yeah." DIAZ then stated, "we might have to knock him out 'cause he got that gun on him." DIAZ questioned the UC as to where the fifteen kilograms of cocaine would be located. The UC responded that he would have two kilograms in a bag and that the remainder would be in the living room. He also stated that the kilograms were stamped and that the stamp would need to be removed before the cocaine "hit the streets" to which PIERCE responded, "yeah." The UC questioned DIAZ, PIERCE, and MOJICA, "We square?" None of the participants in the conversation provided a negative response.

56. The UC walked in the direction of the vehicle containing SOTO and MENDEZ. The UC was joined by COLON 1 and COLON 2. In front of SOTO, MENDEZ, COLON 1 and COLON 2, the UC asked in Spanish, "Are we square?" to which COLON 2 responded, "Yes." The UC then provided a prearranged signal and all subjects were arrested by the ATF Special

Response Team.

57. Subsequent to the arrest, ATF agents conducted a search of CI-2's vehicle, the blue Volvo SUV, and the silver BMW sedan. Agents located a loaded Ruger 9 mm pistol, model SR9C, bearing serial number 333-77332 in the front center console of the blue Volvo SUV. Agents located a loaded Glock .40 caliber pistol, model 23, bearing serial number SM200US inside a brown purse in the trunk compartment of the silver BMW sedan.

58. Subsequent to their arrest, several defendants agreed to waive their Miranda rights and provide statements. Two defendants fully admitted to their participation in the planned robbery. Those admissions, collectively, included information that, prior to their arrival in Stamford, there were discussions amongst the defendants that made clear to all of the conspirators that the object of the robbery was more than five kilograms of cocaine from a stash house, that at least one of the occupants of the stash house would be armed, and that the defendants were armed with firearms that they intended to use in the robbery.

59. Based on my investigation, and the investigation of others, there is probable cause to believe and I do believe that COLON 1, COLON 2, DIAZ, MENDEZ, MOJICA, PIERCE, and SOTO have committed a violation of Title 18, United States Code, Sections 1951(a) (conspiracy to commit Hobbs Act robbery), 924(c)(1)(A)(i) (carrying a firearm during and in relation to a crime of violence), and Section 2 (aiding and abetting), and Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 (conspiracy to possess with intent to distribute narcotics). Accordingly, I request the issuance of complaints in support of their arrests.

60. Finally, I believe that public disclosure of the within affidavit and/or the existence of the complaints for COLON 1, COLON 2, DIAZ, MENDEZ, MOJICA, PIERCE, and SOTO may tend to compromise the investigation or cause other suspects to flee in order to avoid

apprehension or to destroy physical evidence. Accordingly, your affiant respectfully requests that the Court direct Assistant United States Attorney Vanessa Richards, who is assigned to investigate and prosecute this matter and who is an officer of the Court, to retain this affidavit and the complaints, and to maintain said documents in a secure place until further order of the Court.

The foregoing is true and correct to the best of this Applicant's knowledge.

Jeffrey Massey
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me 14th day of April, 2014, at Bridgeport, Connecticut.

/s/ William I. Garfinkel, USMJ
HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE